HALL, Judge.
This is a suit by Mrs. Jennie Bevinetto Vignes against her divorced husband, Albert P. Vignes, for alimony under the provisions of LSA-C C. Art. 160. Following *853 trial on the merits the Trial Judge rendered judgment dismissing plaintiff’s suit at her cost. Plaintiff appealed.
In his written “Reasons for Judgment” the Trial Judge said in part:
“In this case the husband was at fault and was the cause of the ‘trouble’ between the spouses. The wife could have taken proper court action to obtain the protection of her rights under the law. Instead, she saw fit to live in the home, owned by the community, and refuse to have marital relations with her husband * * * The Court is of the opinion that the wife failed to prove that she was without fault.”
The parties were married to each other in the City of New Orleans on November 28, 1946. No children were born of the marriage. In March of 1960 Vignes filed a suit against his wife for separation on the ground of mental and physical cruelty alleging that his wife had refused all marital relations with him for a year prior to March 11, 1960. A reconciliation took place between the parties after this suit was filed and it never came to trial. On September, 16, 1963 Vignes moved out of the matrimonial domicile and after lapse of the required time filed suit for divorce on the ground of having lived separate and apart from his wife without reconciliation for a period of in excess of two years. A divorce on this ground was granted the husband on March 2, 1966. This suit for alimony was filed by his divorced wife on January 25, 1967.
The sole question presented for our determination on appeal is whether Mrs. Vignes was free from fault in the separation.
The record is very confusing as to when the parties became reconciled following the husband’s suit for separation in March of 1960. Mrs. Vignes testified that they became reconciled two weeks later. Mr. Vignes testified that they became reconciled for a short time in June of 1960; that they separated again, and became reconciled again in 1961.
At any rate the record reveals that shortly after the reconciliation Mrs. Vignes refused to have any sexual relations with her husband and continued such refusal up to the time Mr. Vignes left the matrimonial domicile on September 16, 1963. Mr. Vignes testified that during the whole of this time his wife continually cursed him, abused him physically, refused to prepare his meals, tend to his laundry, and in general refused to fulfill her duties and obligations as a wife.
Mrs. Vignes testified that she had refused to have sexual relations with her husband prior to his suit for separation in 1960 because he was “running around” with other women, and that she consented to the reconciliation only because he promised to mend his ways. She further testified that shortly after the reconciliation took place her husband “started the foolishness again.” She freely admitted that from that time on she refused to have any sexual relations with her husband, and admitted that she refused to prepare his meals but only “when he was not giving me money” and when he would not pay the utility bills. She testified that otherwise she fulfilled all of her household duties and obligations. She denied that she ever cursed or hit him. She defended her action in refusing to have sexual relations with her husband on the ground that he was running around with other women and in fact was living with a Mrs. Bartholomew at 1734 Gallier Street at the time of the separation in September 1963.
The question resolves itself into whether Mrs. Vignes’ conduct was justified by the actions of her husband. (See Kendrick v. Kendrick, 236 La. 34, 106 So.2d 707.)
Mrs. Vignes testified that on July 3, 1963 she saw her husband picnicking with Mrs; Bartholomew on the lakefront; that in September of 1963 she came home from work one night and discovered that he had removed some articles of furniture from the matrimonial domicile and testified that he was then living with Mrs. Bartholomew at 1734 Gallier Street. She further testified *854 that while she and her husband were living together she found some “contraceptive devices” in his car. That she confronted her husband with them but he said he didn’t know anything about it. She testified that she also found a pair of bedroom slippers and an alarm clock in his car; that the alarm clock belonged “to the lady in the courtroom” and that her husband called her up and asked her to give the clock back but she refused. She further testified that while she and her husband were living under the same roof she saw him in company with Mrs. Bartholomew almost every night at the lakefront.
Plaintiff adduced the testimony of a Mr. Provenzano and his wife who reside at 1731 Gallier Street directly across the street from 1734 Gallier Street. Both Mr. and Mrs. Provenzano were extemely reluctant witnesses. Mr. Provenzano testified that he had seen Mrs. Bartholomew and Mr. Vignes "around” 1734 Gallier Street; that this could have been as much as four years ago (the trial was held on March 27, 1967); that he didn’t know who lived there; that he had seen Mrs. Bartholomew go in and out of the house but had not seen Mr. Vignes go in or come out; that Mr. Vignes sometimes parked his car on his driveway. He stated that “I mind my own business.” Mrs. Provenzano added nothing material to her husband’s testimony.
Mrs. Marie Guerineau, another witness for plaintiff, testified that she has known Mrs. Vignes and her divorced husband for many years. She further testified that one night during the time Mr. and Mrs. Vignes were living together she was driving on St. Claude Avenue with a Mrs. Mary Ballaeron when her headlights flashed into the car ahead of her at a stop light; that the car was occupied by Mr. Vignes and “the lady” whom she identified as Mrs. Bartholomew, that “ * * * at the stop light there was a quite a bit of hugging and kissing going on and being human and a friend of his wife, curiosity led me to follow them * * She testified she followed them to a playground on Elysian Fields; that they parked under a street light and she parked less than one-half block away; that they were “exchanging affections with each other,” “it was like a movie;” that they were evidently waiting for some children to come out of the playground ; that she watched them for a couple of hours until the ball game was over and the children came out. Mrs. Guerineau testified that on another occasion about two years before the St. Claude incident she had seen Mr. Vignes and a “Mrs. Annabelle something” get into his car near Touro Infirmary. That she followed them in her car and that at the first stop light they began to “clinch.”
Mrs. Mary Ballaeron when called to the witness stand by plaintiff seemed as reluctant to testify as Mrs. Guerineau was willing. She testified that she was riding with Mrs. Guerineau on St. Claude Avenue one night “about two years ago” and Mrs. Guer-ineau said “There’s Jennie’s husband. He’s with a woman;” that they followed Mr. Vignes’ car to a playground on Elysian Fields, where he parked; that Mrs. Gueri-neau did not park at the playground but simply passed by; that she saw no exchange of affection between Mr. Vignes and the woman. Mrs. Ballaeron testified that she did not want to follow the Vignes car because she didn’t want to get involved, that she was only an “innocent by-stander.”
Mr. Vignes testified that he moved to 1734 Gallier Street on September 16, 1963 and has lived there ever since; that at the time he moved into the Gallier Street property no one was living there; that he had lived there alone for six months or a year when he permitted Mrs. Bartholomew to move in; that Mrs. Bartholomew was a very good friend of the family and that he had heart trouble and needed someone in the house so he gave her free rent and she paid the utility bills; that there are three bedrooms in the house; that he occupies the back bedroom and enters and leaves through the kitchen in the rear; that Mrs. Bartholomew occupies the front bedroom with her 16 year old daughter and that her son occupies *855 the middle bedroom. He further testified that he had met Mrs. Bartholomew and her husband in a restaurant about the year 1961 and that the three of them went out together socially; that Mrs. Bartholomew was separated from her husband in 1962 or 1963 and that after her separation and prior to the time she moved into 1734 Gallier Street he and she went out together socially and' that at times he picked her up in his car and carried her to and from work.
Mrs. Bartholomew testified that she moved into 1734 Gallier Street in December 1963 with her 16 year old daughter and 17 year old son; that Mr. Vignes had been living there but moved out when she moved in and did not return until he got his separation which she thought was in 1964; that he moved back in in the latter part of 1964 and occupied the back room while she and her daughter slept in the front room and her son occupied the middle room. Mrs. Bartholomew further testified that she and her husband had known Mr. Vignes since about 1960; that she was legally separated from her husband in 1962 and divorced from him in 1963; that after her legal separation in 1962 she had gone to movies and dances and restaurants with Mr. Vignes and had gone on picnics with him but always in the company of other people; that Mr. Vignes told her he had been separated from his wife since 1961 and she saw no harm in seeing him socially. Mrs. Bartholomew further testified that when she moved into 1734 Gal-lier Street Mr. Vignes was not living there but that she permitted him to move into Gal-lier Street because “I had the empty room and he told me he was divorced.”
This case presents a factual issue and its outcome depends in a great degree upon the veracity of the witnesses. The Trial Court heard and observed them and we did not. When the Trial Court held that “the husband was at fault and was the cause of the ‘trouble’ between the spouses” we take it that he found as a fact that Mr. Vignes was conducting himself improperly with other women particularly Mrs. Bartholomew. We find no manifest error in such finding and in view of such finding plaintiff was justified in refusing to have sexual relations with her husband, and “fault” cannot be attributed to her on that account. (See Kendrick v. Kendrick, 236 La. 34, 106 So.2d 707.)
However the Trial Judge also found that plaintiff failed to prove she was without fault. In so doing he apparently thought that she was at fault in failing to take “proper court action to obtain the protection of her rights under the law.” We do not consider this as “fault” on the part of the wife, and the record otherwise reflects that the wife met the burden of proving she was without fault in the separation.
For the foregoing reasons the judgment appealed from dismissing plaintiff’s suit is reversed, and the cause is remanded to the Trial Court for further proceedings according to law consistent with the views herein expressed; costs of this appeal to be borne by defendant-appellee.
Reversed and remanded.